Case No. 3 for the morning, George Rausch, Jr. v. Hertz Corporation Mr. Razzeri, is that how to pronounce your name, correct? Yes, Your Honor, that's correct. Alright, you may proceed. Good morning. Good morning. My name is Pasha Razzeri, and I represent Appellant George Rausch in this single-count retaliatory discharge case. Today, this case is about whether a jury, not a judge, gets to decide why Hertz fired Mr. Rausch six days after he reported internal forgery of customer documents. The district court correctly held that reporting forgery implicates a clearly mandated Illinois public policy, and there's obviously no dispute that Hertz fired Mr. Rausch. The only disputed element was causation. Is there any question that he was hired, or at least offered the job April 5th? No. And then he's hired April 12th? Correct. Okay. Okay. The district court erred in granting summary judgment because, first, the six-day span between Mr. Rausch's protected activity and his termination creates a permissible inference of retaliation. Second, the support . . . Counsel, we've got Kidwell that talks about that. Yes. But here you also have a probationary period ending, and you have some absenteeism. I think there may be a genuine issue as to whether someone was excused or not. But even if we were to come to a conclusion that this level of timing could raise a genuine issue of that, how would you address the other issues here that cut against your client? All of those other issues. There was ample evidence that there were issues of fact regarding the other reasons, the purportedly lawful reasons for Mr. Rausch's termination. When from the calculation, let's . . . if we represent . . . maybe this is a different question for Hertz as far as the probationary period. When did that start? When did that end? I don't know if . . . I couldn't tell from the record if the parties agreed. I know there was a lot of representation to the deposition of your client, but I don't know if we have agreed, at least on this record, when the probationary period ended. Ninety days from the start date. And do we know what date? Do the parties agree as to when it ended? I don't recall if there's a specific date listed in the record as to when it was ended, but our position is even if there was a probationary period, the district court got the ruling wrong. All right. Because we're trying to determine whether or not there's a genuine issue of fact. Going to Judge Kollar's question, the record is somewhat void in that area as to . . . because there seems to be a suggestion that the parties are contesting what policies, if any, were guiding this decision. Correct. And so, if there's a probationary period, if the parties are agreeing to a probationary period, when did the probationary period stop? What are the policies that were being . . . or in place to guide this decision? But even if there was a probationary period, our position is that then that begs the question as to whether or not there was any non-arbitrary, clear performance standards that Mr. Rush had to live up to, and it's also disputed in the record as to whether or not there was  But we would agree, as an at-will employee, every employee knows that there's some set of rules that guides your conduct at work. Yes. I'm sorry, was that a question, Judge? Is that . . . Yeah, there's no dispute as to his at-will employee status. And so, would . . . is there a case law to support that excessive absences, let's say excused absences, that's the reason that's offered here, why would that not be sufficient? Why? Because there's disputes in the record as to whether or not they're . . . if they're excused, how can they be held against them? Moving on, the district court also erred because the supposed intervening cause that it used to weaken the timing inference was factually disputed. Third, once the defendant chose to offer a purportedly lawful reason for Mr. Rush's termination, there's substantial evidence in the record of pretext that the court either ignored, that it improperly treated as undisputed . . . Counsel, did you take just one deposition? Yes. And that was the 30b-6, correct? Correct. What were the . . . what was the scope of that 30b-6? The scope of it . . . What were the topics? The . . . I'll get . . . maybe I'll just get to my point. Okay. You have three managers, none of whom were deposed, all of whom offered declarations in support of their version of events on summary judgment, correct? Yes. That's a hard spot for a plaintiff to be on summary judgment. Well, all of those three managers gave, after the fact, what we contend are sham affidavits or declarations. You could have asked for discovery on that now. You could have asked the district judge. I didn't think . . . we didn't think it was necessary, Judge, because they presented all of this . . . they say that in the three short months . . . We have said, and we have said this for the benefit of plaintiffs, declarations, affidavits are evidence. And just because it portrays one party's side doesn't make it sham. It would have been sham if you had taken a deposition earlier, and what they put forth at summary judgment conflicted with their deposition testimony, right? But there are still issues of fact, even if this court gives full weight to those affidavits. But what . . . tell me what the issues of fact are. Those affidavits say that in the three months that Mr. Rush worked there, that he had 40 to 50 to 60 transgressions of these rules violations, that his attendance was off, that he . . . And what do you put forth to dispute that? The only piece of evidence that Hertz provided in this case regarding Mr. Rush's performance was a July 5th letter when they transferred his locations, and that letter from his supervisor and manager said there was zero issues with his attendance or behavior or performance that would prevent him from being successful in the second story. I guess I have some concern. There's a case, Liedemann v. Mobile Oil, and it states there, an at-will employee may be required for excessive use of leave so long as the decision is based on the absences themselves and not a protected reason, so irrespective of the report. If the representation is that the absences . . . you are not contesting the absences, and that's . . . Hertz's reliance was on the absences. Why would them being excused or unexcused make the difference? If the reason for the termination is this at-will employee is not coming to work. Because it's inconsistent to use approved absences against an employee. If it's within the policy, if they're allowed to take those absences, then it's inconsistent to hold that against them for its termination. Is there any evidence that they were excused absences? There is evidence in the record where Mr. Rush testifies that he got his approval from the supervisors at the store, Mr. Waterloo and Mr. Padour, and that they approved them for the bereavement leave. They approved them. Hertz's 30B6 testimony, which is binding on the corporation, says that they were often more flexible than the policy provided as far as bereavement leave was concerned. At minimum, there is a chock full of evidence in the record that says these are not . . . these are protectural reasons for its termination. So, to answer my question, was there any evidence . . . I understand the declaration. Was there any evidence put forward to support the representation that these absences were excused? Yes, in Mr. Rush's deposition testimony. Let me try it a different way. Was there any evidence presented by the plaintiff, emails, verb . . . evidence beyond his declaration that supported his representation that they were approved or excused absences? We asked for them. Hertz didn't have any, so no. I notice you're into your rebuttal time. Counsel, would you like to say . . . Yeah, I'll reserve the rest of the time for rebuttal. Thank you. Ms. Quinn. Good morning. Good morning. May it please the Court, my name is Sarah Quinn and I am here on behalf of the Hertz Corporation. This Court should affirm the District Court's granting of Hertz's motion for summary judgment. The District Court's decision should be upheld for two reasons. First, the District Court correctly applied Illinois law, which requires that a plaintiff affirmatively establish a causal connection between his protected activity and his discharge from employment, as opposed to the McDonnell-Douglas framework. Beyond the 90-day probationary period. Let's just start there. Yes. When did it end? Your Honor, our records indicate that the probationary period ended on August 11th, if you count work days and not weekends. The August 11th, 2022 is when Hertz represents that the probationary period ended? That's our counting of 90 work days, Your Honor, yes. All right, and where is that in the record? He was terminated on August 1st, so we've maintained in the record consistently that he was on a probationary period his entire employment. And again, August 11th, where is that date in the record? That date, Your Honor, is something that we calculated in preparation for today in our motion for summary judgment. So no one represented based on the record when the probationary period ended? Correct, Your Honor, because we represented that his entire employment was during the probationary period. And based on what calculation? If he started, what we have in the record is April 12th. That's right, Your Honor. So April 12th through August 11th. That would have been the conclusion of 90 work days. Does the policy say that it's work days and not calendar days? Typically, it's 90 days, period. Three months later, employees are evaluated. I haven't seen this work day calculation before. Your Honor. Is it supported by the policy? The representations made to Mr. Rush, which are supported in the statement of facts, which Mr. Rush is indisputed, is that his supervisors expressed to him that for the first 90 days of his employment, he would be on a probationary period. And during that probationary period— But, no, the question is more narrow than that.  Where is this definition of what counts for 90 days? There isn't a representation in the record, Your Honor, about whether it is calendar days or work days. So for a summary judgment, we would have to view the evidence in the favor most likely to the plaintiff. That's correct, Your Honor. But the fact is undisputed that he was on a probationary period through the decision to terminate him on July 8th. I don't see that, though. If you look at the deposition that was referenced, docket 105— Yes. Do you understand that your employment at Hertz was not guaranteed? His response, I knew there was a probationary period. What did you understand that probationary period to be? 90 days. Did you understand that you could voluntarily quit at any time? Yes. And so I know we're wanting to extrapolate from that that he knew at the time of his termination that he was in a probationary period. Is there anywhere else you would direct us to? The statement of facts, Your Honor, where he says it is undisputed that he spoke to his supervisor, Chris Waterloo, and that Hertz informs all employees of the probationary period when they begin their employment, that the probationary period is a period where Hertz determines whether the employees meet the expectations and standards for the role they were hired, and that it is the first 90 days of an employee's employment at Hertz is considered a probationary period. That is undisputed by the plaintiff. Now, our calculation— It sounds like everybody agrees when it started. It sounds like no one knows when it ended. Well, if we do the quick math here, May, June, July, and we look at the cumulative employment record of Mr. Rush, he had, and it is undisputed in the record, excessive absenteeism and poor performance in those 90 days of employment. There is no question.  No, that is questionable because there's a representation made by Hertz on July—I believe it's July 5th. I have here docket 105, 199, and his supervisor during his transfer says, there are no circumstances based on performance or behavior that would indicate they will not be successful in a different role. And so the representation at least a week before he's terminated is that there are no performance or behavior issues. And so were the absentees that you're representing excused or unexcused? Hertz would take the position that many of the absences that Mr. Rush engaged in were unexcused, but I don't think that whether they are excused or unexcused is a material fact in this case, Your Honor. As you outlined in the questioning of Mr. Rush, whether someone is excused or unexcused does not prohibit the employer from terminating the employee's employment. In fact, this court has looked at this issue in Fuqua v. Thompson v. Consumer Electrics and Ragland v.— Right, I mean, you could take the risk and terminate him, but the problem is that it happened six days after he made this complaint. So, yes, you can do that, but you run the risk of being up here in the Seventh Circuit Court of Appeals— That's right, Your Honor. —defending on summary judgment, right? To the issue of the timing, if I may, the district court correctly concluded that the six-day period from when Mr. Rush made a report of forgery and engaged in protected activity and six days later when his supervisor submitted an internal email outlining the series of performance issues that Mr. Rush had engaged in and suggested his termination is outside the outer limits of the cases that this court has evaluated with respect to timing, suspicious timing. Suspicious timing is not enough to survive summary judgment, but the court didn't make a hard-line rule. Well, but the statement, I guess it was a week prior from—and this would have come from the Schomburg store manager. Is that Waterloo? Is that his name? Christopher Waterloo was the supervisor at Schomburg. Yes, okay, his statement saying there are no issues with this employee, he's okay to transfer. You know, that is something, right? Well, yes. That is happening a week before his termination, correct? The value and the weight of this evidence is very important, and the district court considered this. And that form was the result of the Schomburg location closing and Mr. Rush being transferred to the Des Plaines location. So it was in order for Mr. Rush to continue his employment as the director of finance and insurance at a location that would still be in operation. Is that the only— I'm sorry, go ahead. No good deed goes unpunished, but that's not the way we view the record. That's right, Your Honor, but Mr. Waterloo submitted a declaration in this case that explains every— That goes to counsel's on the other side's point, that these declarations flooded the record after Hertz had represented a week before they terminated him, that he had no performance or behavioral issues. And we're asking, what are they—is there a dispute there? Because you're asking us to accept the declaration but not look at the record. The weight of—the record— Do we weigh evidence at summary judgment? It is undisputed, Your Honor, that Mr. Rush was absent at least six times. And this is undisputed with his own testimony at his deposition and the facts that he leaves undisputed in the statement of facts. What is also undisputed is that these absences were excused by his employer and then used by his employer to justify a termination four days after he exposes ongoing fraud by his supervisor at the new location. Your Honor, the—it was six days after, when he gave his report to his supervisor, it was six days after the supervisor discussed the performance issues. The significant intervening event that the court references in her decision is that Mr. Rush gave a report on July 12th and then was absent July 14th, 15th, 16th, all for a local funeral of his half-sister's father, which even if the bereavement— Was the bereavement approved? No, ma'am, because the bereavement policies did not apply to Mr. Rush. And even if it did— That is, if you accept he was on the—but we have nothing in the record to tell us whether or not he was in the probationary period or not. We know that he started April 12th. We know 90 days from that is July 11th. And so if that is a fact that we accept, the bereavement policy would have applied. And so July 14th, 15th, and 16th, what do we have in the record to suggest in the record that this bereavement leave was not approved? If you want to—if we take the proposition that the bereavement policy that is in the record would apply to Mr. Rush, even that bereavement policy would not have allowed a three-day absence for— I don't think we understand my question. Is there anything in the record from Hertz to demonstrate that the 14th, 15th, and 16th were unapproved absences? The declarations from his supervisors, Your Honor. So nothing at the time to suggest on the 14th unexcused absence, there's no record-keeping policy that when an employer sees that an employee is not at work, there is nothing from record-keeping that Hertz does to be able to kind of identify when an employee is at work or not at work. There certainly is, Your Honor. But the supervisor that Mr. Rush reported, Jerry Pavlov, was the same supervisor that would have been keeping those records. And he was removed from his post during the investigation because Hertz promptly and swiftly investigated Mr. Rush's report of forgery and disciplined those actors. So there was no supervisor— And we have Hertz's representation that his leave was not approved the 14th, 15th, and 16th. Yes, but that is not a material fact, Your Honor. And so is that an external fact? No. I would argue that it is not, given the case law that clearly demonstrates, as you raised on your questioning earlier, that an employer may discipline up to and including termination an employee who has demonstrated excessive absenteeism. This individual, without question— Can you have excessive absenteeism in a week? I'm sorry? Can you have excessive absenteeism in one week? Certainly, Your Honor, especially if you're absent the 14th, the 15th, the 16th. But do you have any case law saying that that is enough? Because the Illinois state cases relied on there, I think, are factually distinguishable. I am looking at what we presented during our arguments for the motion for summary judgment. FUCA v. Thompson v. Consumer Electric and Raglan v. Rock, Tennessee were similar deficiencies warranted dismissal. And in those cases, being consistently tardy, problems with absenteeism, difficulty performing tasks that were responsible in their management, were all lawful reasons for discharging an employee. And what was the excessive absenteeism for the case? Unfortunately, Your Honor, I don't have that factual information in front of me. Was it three days? I can't speak to that, Your Honor. I have a question. Mr. Schutte, is that the correct pronunciation?  Schutte was the decision maker. That's right, along with the HR professional. And Mr. Schutte is a regional type manager, is that correct? He is the national finance and insurance manager. At the time, he was, Your Honor. Okay. Is there anything in the record about whether it's typical for a regional manager to be involved in the termination of a probationary employee for alleged excessive absenteeism? No, Your Honor, there's not. Mr. Rush had a unique position. Each dealership, or in this case, they're selling Hertz's former rental cars. Each dealership has a finance and insurance manager that is tasked with selling warranties or providing extra services when someone purchases a car. It's a unique position, unlike sales representatives or others, because they're filling out title paperwork, et cetera. And remember, at that time, there was a closure and there was a lot of shuffling. So the national finance and insurance manager was stepping in to provide leadership as these dealerships were shifting around. And because Andrew Schutte directly oversaw the finance and insurance managers at each individual dealership, he was the one that was consistently giving Mr. Rush feedback about the completion of his paperwork and other performance issues that Hertz had been observing. So who did Mr. Rush report to? Was Mr. Schutte or was it the store managers? Typically, the dealership manager heads each dealership. Christopher Waterloo was Mr. Rush's supervisor at the Schaumburg location prior to its closure. Then when Mr. Rush moved to the Des Plaines location, it was a different manager named Jerry Paslov. And within the first few days of Mr. Rush being there, he discovered the forgery that was then reported, and Mr. Paslov was the subject of that. And Christopher Waterloo was sort of a floating manager while Hertz figured out where he was supposed to land, given that they had closed the dealership. So there was no store manager, dealership manager at the time of Mr. Rush's termination, and so Andrew Schutte was involved in supervising his position. What is the best argument that you would present for the lack of documentation? One, I think that this was a very short time period that Mr. Rush worked at Hertz, and he was a unique manager in that he was handling nothing related to the sales but only related to the paperwork. A dealership manager wouldn't have insight into the finance and insurance pieces that Mr. Rush was selling. Only Andrew would. So there was a team of supervisors, if you will, and I think in such a short period, and when a person is frequently absent, it creates a lack of systematic organized paperwork. Isn't this an argument for a jury, though? Your Honor, it would be an argument for a jury if there weren't clear, undisputed facts here. And that is that the record about how much Mr. Rush was absent, how many procedural and performance deficiencies he had… There's no record of performance issues. It's admitted in the record, Your Honor, by Mr. Rush himself. There's no admission in the record that he had performance issues. He admits to being tardy. He admits to being absent. He admits to leaving work early. He admits to getting approved absences. Not everyone he admits to, Your Honor. He specifically focuses… You said performance, though. As regards to tardy, regards to documentation. I'm glad you brought that up. We're asking for documentation. Yes. Well, there is a document. I want to speak specifically to performance before I sit down. But with regards to documentation, we have Andrew Schutte, who was serving as a supervisor to Mr. Rush, in a July 18th email document a long history of issues.  Yes, it is. Okay. And so can you tell us where it is so we can go to it? Certainly. It is a July 18th email. Let me see if I have that marked. But July 18th, that's the day that he calls in regarding COVID, right? That's the day of the termination. That's the day the decision to terminate was made. He wasn't terminated. Oh, okay. So we're referencing the July 18th email. Okay. Yes. Well, we don't have any documentation leading up to demonstrate a performance issue. When you ask if there's documentation of her, for example, marking down absences into a record or other than testimony, Your Honor, we have an internal email from his supervisor to the leaders of HR discussing performance issues. And that was the date of the termination? The date that he recommended his termination. The July 18th date? Yes. But I want to make sure we distinguish. That's all we need, counsel. Thank you. Would you like me to speak to? No. Okay. We're out of time. Thank you. Thank you, Judge. Good morning again, mate. Please, the court. I will try to make best use of the short time that I have. I just wanted to touch on the timing element here, even though Mr. Rush's argument is not just a timing argument. It's timing plus pretext. I would bring to the court's attention that the Kidwell case that the district court relied on, it does not lay out a bright line rule. That opinion, this court said that it typically allows for a span of a few days. Importantly, that span of a few days was presented in that holding by contrasting it to the facts of that case, which was a couple months ago. How do we distinguish from the case law represented by your counsel from the other side that excessive absences is enough in this circuit to terminate an at-will employee? Other than what we put in our papers, I don't have any other argument besides what we put in there, but I just don't see how approved absences would be held against an employee. If it's the employer's policy to approve the absences, how do you turn around and then say, because you were comporting within this attendance policy or targeting this policy or whatever it might be, that we're terminating you for it? In addition, the intervening cause that the district court relied on, it's a material fact, and there was genuine issues regarding that. The July 14th to July 16th bereavement leaves, there's evidence in the record that Mr. Rush didn't even report to Mr. Schutte, who said they were unapproved, that the leave for those absences went through his local store managers. As I indicated earlier, Hertz's 30B6 designee... But without any depositions, without any evidence, you have to accept Hertz's representation that your client had performance issues that plagued him from April or however long until the decision or the representation July 18th that he needs to be terminated. I would submit to the court that that's the issue for the jury to decide, because there's not... It's disputed whether or not these policies in their employee handbook apply to Mr. Rush. But would you not have to accept that he had performance issues? Not as an undisputed fact, no. You're out of time, counsel. Would you like to wrap up? Yes. For the remainder, we'll rest on our papers. We respectfully ask that this court reverse the district court's grant of summary judgment and remain for further proceedings. Thank you. Thank you, Your Honor. We'll take the case under advisement. We thank you both.